

Steven Riznyk, Esq. SBN 135688
**SAN DIEGO BIZ LAW APC**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone: (619) 793-4827
Facsimile:  (310) 388-5933

Attorneys for Plaintiff, JOHN LINDLAND

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

JOHN LINDLAND, an individual,

                Plaintiff,

v.

TUSIMPLE, INC., a California corporation, and DOES 1-100, inclusive,

                Defendants.

Case No.: **'21CV0417 JLS  MDD**

Judge: Hon.

**VERIFIED COMPLAINT FOR:**

**(1) Retaliation in Violation of a Public Policy**
**(2) Wrongful Termination**
**(3) Hostile Work Environment**
**(4) Breach of Implied Covenant of Good Faith and Fair Dealing**
**(5) Conversion**

**DEMAND FOR JURY TRIAL**

San Diego Biz Law, APC
4225 Executive Square, 6ᵗʰ Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

San Diego Biz Law, APC
4225 Executive Square, 6ᵗʰ Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

**JURISDICTION AND VENUE**

1. Jurisdiction exists because this Court has a diversity jurisdiction over the parties under 28 U.S.C. §1332(a)(1), which states that "the district courts shall have original jurisdiction of all civil actions where the matter in controversy is between the citizens of different States."

2. Plaintiff a citizen of Arizona, while Defendant is the citizen of California.

3. The damages Plaintiff suffered exceed the requisite the sum or value of $75,000, exclusive of interest and costs as required by 28 U.S.C. §1332.

4. Venue is proper under 28 U.S.C. 1391(b)(1), which states that "a civil action may be brought in a judicial district in which any defendant resides, if all defendant are residents of the State in which the district is located," because Defendant resides in California and in the Southern District of California, while Plaintiff resides in Arizona.

**PARTIES**

5. Plaintiff, JOHN LINDLAND (herein "Plaintiff" or "Lindland"), was and is at all times mentioned a resident of the State of Arizona.

6. Defendant, TUSIMPLE, INC. (herein "Defendant" or "TuSimple"), was and is at all times mentioned a resident of the State of California, Southern District. TuSimple is a technology company that operates self-driving trucks and develops commercial ready Level 4 (SAE) fully autonomous driving solution for the logistics industry.

7. The true and correct names of Defendants named herein as DOES 1 through 100, inclusive, whether individual, corporate, agent, servant, employee, partner, associate, joint venturer, co-participant, co-conspirator, associate or otherwise are not now known to Plaintiff and such Defendants are therefore sued by fictitious names. Plaintiff will amend his Complaint to allege their true names and capacities when ascertained. By reference to Defendants,

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

Plaintiff intends to, and does refer to each and all of the Defendants named herein in each and every capacity sued herein.

8. Plaintiff is informed and believes and on such information and belief alleges that each of the Defendants are now, and have been at all times herein mentioned, were the agent, servant, employee, partner, associate, joint venture, co-participant, co-conspirator and/or principal of, or with each of the remaining Defendants, that each Defendant has been, at all times herein mentioned, acting within the scope of such relationship and with the full knowledge, consent, authority, ratification and/or permission of each of the remaining Defendants.

9. Plaintiff is informed and believes and thereon alleges that Defendant adopted, ratified and authorized the conduct of their Co-Defendants and had advanced knowledge of the behaviors of his employees and employees of his Co-Defendants. Each act complained herein was performed, ratified, condoned and known about by either the Defendant(s) or an officer, director or managing agent of Defendant(s).

10. Plaintiff is informed and believes and based thereon alleges that all times herein mentioned, a unity of interest exists between the Defendant such that there is no distinction between the individual Defendants named herein and the entities and if the acts alleged herein against the entities are treated as the acts of entities alone, an inequitable result will follow.

## SUMMARY OF THE CASE

11. This case involves a hard-working and a dedicated employee, Lindland who always adhered to the utmost principles of his work.  He conducted all of his duty with professionalism and ethics, and he always cared about the functional safety of TuSimple's vehicles and the lives of drivers.

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

12. Lindland was hired in order to control the safety aspect of TuSimple's vehicles, which could weigh as much as 80,000 pounds and would be moving across America's roads autonomously.

13. TuSimple concentrates its work with trucks, therefore they are much heavier than passenger vehicles.

14. Lindland was later fired on trumped-up charges. They were meant to deflect the fact that Lindland refused to simply 'sign-off" on safety standards that were simply not met.

15. Lindland did not want to place Americans at risk, nor did he want to risk civil and criminal liability for adults and children who would be killed, rendered quadriplegic, paraplegic, or suffered brain or other injuries.

16. Defendant was not as concerned about the safety of their vehicles as Lindland.

17. Lindland suffered various forms of retaliation included, but not limited to, sabotage of his projects, reduction of his work, isolation, the undermining of his authority with his team, verbal and physical threats, and false accusations of sexual harassment in order to mask the real reason as to why Defendant had wanted him to leave the firm, so that they could save on the stock options he would receive if his employ were terminated without cause.

18. Finally, Lindland was wrongfully terminated under the excuse that he was "disruptive" and "did not do his job," while the real reason for his termination was the fact that he would not falsify information with respect to safety as human lives were at stake.

## **STATEMENT OF FACTS**

19. On August 24, 2018, Lindland began working at TuSimple as a Functional Safety Engineering Lead. Upon hiring him, the CEO, Xiaodi Hou ('Hou') requested Lindland to solve a localization problem. Although that task was beyond the scope of Lindland's duties

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

he still provided an effective solution, which disappointingly were not appreciated by Hou. (See Plaintiff's Employment Contract, incorporated by reference in full as Exhibit A).

20. Lindland has a great expertise in functional safety. His resume listing his projects and accomplishments is attached hereto as "Exhibit B," incorporated by reference in full.

21. Lindland started to work with the design teams on Functional Safety Analysis. The Perception Team was led by Hou, who had *never attended a single team meeting* or provided any useful leadership. **Hou was unreachable**; it was almost impossible for Lindland to schedule a meeting with him or to engage in conversation, which added innumerable challenges to his work.

22. Lindland worked with the Perception Team from September 2018 until December 2018. Although Hou did not participate in the team's work, on December 2018 he accused Lindland of not analyzing "his (Hou's) design," and that the teams with whom Lindland had been working were not correctly focused; Hou then requested Lindland to stop working with his teams.

23. Hou's teams dictated the designs which Lindland had to work on, and it was their responsibility to ascertain that Lindland's team fulfilled all the requirements. Hou even interrupted Lindland's analysis of a functional block diagram which they had developed together, stating that it was wrong, without recognizing that he himself developed it.

24. During the first couple of months of his employment, Lindland realized that *Hou did not understand the organization of the work*, the difference between a partnership and a development agreement, which caused issues in working with TuSimple's clients such as Volvo, Peterbilt and Navistar, and, most importantly, how risk assessment was often overlooked by other of TuSimple's engineers.

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

25. In November 2018, Hou expressed to Lindland that the functional block diagram needed to be changed and Lindland had to cease his work until he was provided the new design to study. In other words, Hou wanted to circumvent the safety requirements and eliminate them from Lindland's work.

26. In the interim, to increase TuSimple's production quality, Lindland hired an international consultant to assume the role of quality manager, Ms. Loretta Greer. For its projects, TuSimple required Functional Safety to comply with IATF 16949 (an automotive quality management system), for which they required a consultant such as Ms. Greer.

27. Ms. Greer implemented a number of quality management systems and audited them internationally. In response, Mr. Chuck Price (Chief of Product Development and Lindland's supervisor) rebuked Lindland as "the only thing I want you working on is Functional Safety." Hiring Ms. Greer was the part of addressing Functional Safety, but Mr. Price did not understand the scope of functional safety and its protocols (protocol ISO 26262); nor did he understand formal quality management systems.

28. TuSimple also **violated National Highway Safety protocols** covered by the Electronic Code of Federal Regulations such as Electronic Stability Control Systems for Heavy Vehicles (9 CFR Part 571), Recordkeeping and Record Retention (49 CFR Part 576), and Reporting of Information and Documents About Potential Defects; Retention of Records That Could Indicate Defects (49 CFR Part 573, 574, 576, 579).

29. In January 2019, the system was ready to be studied.  Unfortunately, on or about January 22, 2019 Hou asked Lindland to stop working on the Systems Analysis until further notice. Lindland used this time to review Functional Safety documentation.

30. In February 2019, Lindland commenced working with the Perception teams once again.

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

31. In February 2019, Mr. Price asked Lindland to draft simple forms that people could use to fill out in order to satisfy functional safety requirements. *The request had the scope of creating the **appearance** of performing work without "conducting the work".* For the functional safety, when a self-driving vehicle with no driver at the wheel will be driving down the roads at 65mph and weighing up to 80,000 pounds, every function must be analyzed.

32. Lindland, refused to comply with such a request as it would have endangered the public. Moreover, in the likely event of a collision, if the study was to be found inadequate, Lindland would have been responsible and liable, with possible criminal liability as well.

33. On May 9, 2019, Mr. Alexander Mouschovias, Mr. Price's program manager, realized that Lindland had a DFMEA meeting scheduled with Jeffrey Renn on the backup power design. Mr. Mouschovias scheduled another meeting, creating a conflict, and asked Lindland to cancel his. Lindland refused and Mr. Mouschovias then forced Mr. Renn to ignore Lindland's meeting. Additionally, Mr. Mouschovias was hostile to Ms. Greer during all the architectural meetings. Clearly, safety was a bottom priority and there were consequences for Lindland for not following that narrative.

34. In June 2019 Lindland was asked to cease his work because the teams were not ready.

35. In August 2019, Lindland was finally able to resume his work.

36. In September 2019 Hou ordered him to stop again, and wait at least until January 2020, which turned into Lindland having to wait until February 2020.

37. In the interim, Lindland received a 4 out of 5 grade performance review, as well as compliments from Mr. Price on how great his performances were and how everything was solid and that he and TuSimple were pleased with his job.

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

38. Between September 2019 and February 2020, Lindland contacted Hou several times to prepare the teams. He had never received the approval. While waiting, Lindland worked on collateral projects and generated solutions and ideas, which he shared with many other colleagues in order to accelerate the process. Unfortunately, his willingness of his to improve the company's procedure generated resentment more than appreciation.

39. Those who worked for Hou were basically taught that the ***Functional Safety is a waste of their time***. One of Hou's favorite phrases was "we are going to do Functional Safety the TuSimple way," meaning ignoring the legal requirements of ISO 26262 and IATF 16949. This direction was coming from the CTO and Co-Founder of TuSimple.

40. There were several issues with the quality management systems implementation. There was a lot of active resistance and no real support from Messrs. Price and Hou. Mr. Price sent a company-wide text in reference to Ms. Greer stating that "we do not have time to do this theoretical quality stuff." Ms. Greer then resigned. Lindland was able to convince her to remain part-time to help the transition to a new quality manager; she agreed and remained until December 2019 and maintained a full record of everything that happened at TuSimple.

41. In December 2019, one employee accused Lindland of sexually harassing another employee. The alleged victim, denied she had ever been harassed by Lindland. She even admitted to herself asking Lindland out 5 times in the past. He had to deal with the fallout of all of this with no support from management.

42. Lindland also had to participate in a feud within the Tucson office.  He was required to punish an employee accused of not doing his job without actual evidence of his poor performance. Lindland organizes an alignment event, which resolved the situation. Lindland was praised by the HR and the VP of Engineering.

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

43. In December 2019, Lindland received an email from Mr. Price stating that everyone who previously worked for Lindland would now respond to Mr. Price. There was no explanation for such a drastic and unfair decision. Additionally, this made it even harder for Lindland to conduct his job.

44. In February 2020, Lindland, on his own initiative, started working with the algorithm teams. On February 21 and 22, 2020 a "TuSummit World Domination 2020" meeting was held. During the meeting there was a workshop where each director identified 3 departments/functions that they considered fundamental. Quality and Functional Safety **were not mentioned**, despite Hou and Mr. Price *falsely* advertising to their customers how Functional Safety is <u>concern number one</u> at TuSimple.

45. When it was Lindland's turn to speak, he repeated the importance of Functional Safety and its steps, which were to be followed mandatorily. TuSimple was designing systems to get the driver out on the freeway hub to hub for more than 100 miles. Lindland was the one who developed the initial driver-out plan, and was the only one who really understood the risks associated with superficial or non-existent risk and functional safety analysis methods. Lindland clearly stated: "If perception does not complete their functional safety analysis before driver-out, I will not sign off on the test." Even though Lindland sensed that he would be terminated, he held onto his principles because he did not want to risk peoples' lives.

46. During the meeting, Hou suggested that Lindland create forms and "cut-and-paste" information into forms, and <u>*create the appearance that risk analysis occurred*</u>. Hou was also bothered by the fact that the different teams only found 2-3 failure modes and that each function had the same potential causes/sources, but their fault/failure mode behaviors were

different. Lindland tried to explain this, but *Mr Hou refused to listen*. His goal was solely to diminish Lindland, complaining about how he was not effective. Lindland then offered to add a different failure mode to the analysis. Hou did not respond and again avoided his responsibility as a manager.

47. On March 5, 2020 Lindland had a meeting with Hou, who was concerned about Lindland having not completed his job. Lindland started working in September 2018 and was blocked by Hou only 3 months later. He finally was able to resume in December 2018, but after he and his teams recreated their functional block diagrams and moved forward, they were told to stop and throw everything away everything. As a result, in March 2020 the project had at least 5 to 6-month delay.

48. In March 2020, Mr. Price revealed to Lindland that during a director's meeting in San Diego, *Hou asked him to terminate Lindland.* Mr. Price stated that he refused, but that Lindland had to change his approach and *approve whatever Hou would put in front of him.* Lindland replied TuSimple *needed to conduct both a complete analysis and real work.* After this conversation, another engineer at TuSimple asked Lindland to stop including the Vehicle Control team in his e-mail conversations regarding functional safety; they did not want to have problems in dealing with Functional Safety. *They were not concerned with the safety of the program; they just wanted to pass it through.*

49. On March 18, 2020, Lindland was terminated. He was blamed for telling the executive team that he was not going to (falsely) sign off on perceptions functional safety work, unless it was solidly completed. He was in charge of safety and he simply wanted to conduct his job duties, while *Hou was only concerned with obtaining quick funding and money, regardless of the safety and functionality of the products.*

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

San Diego Biz Law, APC
4225 Executive Square, 6ᵗʰ Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

50. Lindland did not receive his severance pay because he was allegedly "terminated for cause;" that is, for being "disruptive" and "not doing his job". In fact, Lindland was "disruptive" of TuSimple's massive fraud on the company's investors which could have places many lives at risk.

51. TuSimple had a habit of ignoring truly disruptive employees. Mr. Todd Skinner, Director of Mechanical Engineering had a significant number of HR complaints. Mr. Skinner is known for yelling, screaming, and swearing at people.

52. On one occasion, Mr. Skinner threatened Lindland in front of the HR personnel and pushed Lindland in the doorway as a form of domination. Lindland felt cornered, scared and shocked. Even though the Human Resources employees witnessed this, but Mr. Skinner is still employed by TuSimple and protected by Mr. Price.

53. Mr. Skinner was one of the first people who refused to work with Functional Safety. Since then he actively undermined Lindland and the quality department. In their first, he clearly stated that he did not want to work with Lindland's team.

54. The timing of his position's termination was strategic in nature. He was promised 150,000 share options at $2.11 value when he was hired and as they did not vest, this resulted in a loss of approximately $316,500 and climbing.

### FIRST CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF A PUBLIC POLICY

55. Under California Government Code § 12940(h) it is an unlawful employment practice for any employer to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

56. Under California Code of Regulations §11021(a)(1), it is unlawful for an employer or other covered entity to demote, suspend, reduce, fail to hire or consider for hire, fail to give equal consideration in making employment decisions, fail to treat impartially in the context of any recommendations for subsequent employment that the employer or other covered entity may make, adversely affect working conditions or otherwise deny any employment benefit to an individual because that individual has opposed practices prohibited by the Act or has filed a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing conducted by the Council or Department or its staff.

57. Under California Code of Regulations §11021(a)(1)(C), opposition to practices prohibited by the Act includes, but is not limited to opposing employment practices that an individual reasonably believes to exist and believes to be a violation of the Act.

58. It is well established that a termination premised on an employee's refusal to violate either a statute or an administrative regulation may support a claim for wrongful termination in violation of a public policy. (*Nosal–Tabor v. Sharp Chula Vista Medical Center*, 239 Cal.App.4th 1224, 1235 (2015)).

59. Employees are protected from retaliation for reporting safety concerns regarding vehicles under the Surface Transportation Assistance Act (the "STAA"), 49 U.S.C. § 31105(a)(1)(B), which prohibits the discharge of an employee who complains about the violation of a "motor vehicle safety or security regulation, standard or order[.]" *(Clean Harbors Environmental Services, Inc v. Herman*, 146 F.3d 12 (1998) (employee who made complaint that is purely internal to employer is protected by retaliation provisions of STAA)).

60. To establish a prima facie case of retaliation, the Plaintiff must show that (s)he engaged in a protected activity, their employer subjected them to adverse employment action, and there is

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

a causal link between the protected activity and the employer's action. (*Iwekaogwu v. City of Los Angeles* 75 Cal.App.4th 803, 814 (1995)).

61. ISO 26262 is an internally recognized standard related to the functional safety of electrical and/or electronic systems in motor vehicles. Lindland engaged in protected activity throughout his employment by engaging in his job-related right and/or privilege of reporting his concerns that the Gen2 would not comply with the functional safety requirements of ISO 26262. His supervisors blatantly told Lindland to stop talking about human safety issues, to stop talking about sensors, and to essentially not to do his job. When Lindland refused, his employer subjected him to a retaliatory termination.

62. As in *Iwekaogwu*, where Plaintiff engaged in a protected activity by complaining about discrimination and expressing that he would file a complaint, Lindland complained about unlawful practices that violated administrative regulations along with the federal and state statutes and regulations.

63. Because of this complaints and refusal to participate in violations of administrative regulations, Lindland experienced a serious of adverse employment actions against him such as: (1) isolation from the team and other employees; (2) transfer of Lindland's authority over his team to Mr. Price; (3) sabotage of Lindland's projects by constantly interrupting and delaying his work; (4) Mr. Skinner's verbal and physical attacks on Lindland; and (5) wrongful termination.

64. There is a causal link between Lindland's complaints and his wrongful termination because he was terminated as a retaliation for his complaints and refusal to conduct unlawful practices.

65. As in *Iwekaogwu*, Defendant offered a non-retaliatory explanation for its acts, such as poor

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

performance and not following directions. Even though Defendant is offering a pretextual explanation for Lindland's termination, according to *Iwekaogw,* "a plaintiff is not limited to a direct attack on the employer's explanation and there are at least 3 types of evidence can be used to show pretext: (1) direct evidence of retaliation, such as statements or admissions; (2) comparative evidence; and (3) statistics." (*Iwekaogwu* at 814)*. Lindland also offers both direct evidence of retaliation and comparative evidence.

66. Direct evidence of retaliation may consist of remarks made by decisionmakers displaying a retaliatory motive. (Id. at 816).

67. The facts here presented include several remarks by Lindland's supervisors against him that can be interpreted as an intent to retaliate against Lindland for his complaints. Those remarks are, including, but not limited to: "you are refusing to listen," and "Hou wanted me to fire you." Other direct evidence of retaliation is Mr. Skinners physical attack on Lindland because of his complaints.

68. Lindland underwent other issues: (1) isolation of Lindland from the team and other employees; (2) transfer of Lindland's authority over his team to Mr. Price; (3) sabotage of Lindland's projects by constantly interrupting and delaying his work; (4); Human Resources' failure to protect Lindland.

69. TuSummit discharged Lindland after he stated to Mr. Price that he (Lindland) wanted to complete risk analysis **before** signing any safety certificate, because TuSummit wanted him to sign safety certificates without conducting the required testing protocols.

70. By wrongfully terminating Lindland, TuSimple also ceased providing employment benefits to Lindland, which Lindland had every right to receive.

////

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

**Malice**

71. The acts and conduct of TuSimple, constituted "malice" as defined by California Civil Code § 3294(c)(1)): "the conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."

72. TuSimple engaged in a despicable conduct with a willful and conscious disregard of the rights or safety of Lindland as well as concern for his career and career reputation. The acts of TuSimple were conducted fraudulently, maliciously and oppressively and with the advance knowledge, conscious disregard, authorization, ratification or act of oppression, within the meaning of Civil Code § 3294.

73. The actions and conduct of TuSimple were intended to cause injury to Lindland and to deprive him of property and legal rights. TuSimple's despicable conduct justifies an award of exemplary and punitive damages in an addition to all other awards.

**SECOND CLAIM FOR RELIEF**

**WRONGFUL TERMINATION**

74. It is well established that a termination premised on an employee's refusal to violate either a statute or an administrative regulation may support a claim for wrongful termination in violation of public policy. (*Nosal–Tabor* at 1235).

75. In *Sequoia Ins. Co. v. Superior Court*, although a claim for wrongful termination in violation of public policy requires "a constitutional or statutory provision [which] sufficiently describe[s] the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law," it is not required that the constitutional or statutory provision prohibit the precise act of the employer (e.g.,

discharging an employee for refusing to commit a crime). (*Sequoia Ins. Co. v. Superior Court* 13 Cal.App.4th 1472, 1480 (1993)).

76.  "The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm." (*Nosal–Tabor* at 1224).

77. TuSimple was on notice of the long-established policies about safety protocols, but have still decided to violate all the safety protocols in order to make a bigger profit.

78. "Policy underlying a wrongful termination in violation of public policy claim, must satisfy the following requirements: (1) the policy must be supported by either constitutional or statutory provisions; (2) the policy must be "public" in the sense that it protects the benefit of the public, rather than serving merely the interests of the individual; (3) the policy must have been articulated at the time of the discharge; and (4) the policy must be fundamental and substantial." (*Casella v. SouthWest Dealer Services, Inc.*, 157 Cal.App.4th 1127, 1130 (2007)).

79. There is an employer-employee relationship because Lindland was employed by TuSimple, and according to their contract, Lindland was not an independent contractor.

80. The employer, TuSimple, terminated Lindland's employment in March 2020.

81. Lindland's termination was substantially motivated by a violation of public policy, in violation of California Government Code § 12940(h) and California Code of Regulations §11021(a)(1), because Lindland complained several times about TuSimple's unsafe and unlawful practices, described above.

82. Discharge caused Lindland harm as he suffered economic damages, loss of benefits, and

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

significant emotional distress and humiliation.

83. The policy is supported by statutory provisions such as California Government Code §12940(h) and California Code of Regulations §11021(a)(1).

84. The policy is public because it protects the benefits of the public rather than merely the interest of the employee, Lindland.

85. The policy has been articulated and has existed in March 2020 when Lindland was wrongfully terminated.

86. The policy is fundamental and substantial as defined by and California Government Code § 12940(h) and California Code of Regulations §11021(a)(1)(C).

87. As a result of this tortious, wrongful termination Lindland sustained sizable losses in earnings and other employment benefits according to proof. As well as being afflicted with emotional distress caused by his substantial loss of income, loss of severance payment and the hostile work environment TuSimple created to force him to _comply with the aforementioned illegal activities._

**Malice**

88. The acts and conduct of TuSimple, constituted "malice" as defined by California Civil Code § 3294(c)(1)): "the conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."

89.  TuSimple engaged in a despicable conduct with a willful and conscious disregard of the rights or safety of Lindland as well as concern for his career and career reputation. The acts of TuSimple were conducted fraudulently, maliciously and oppressively and with the advance knowledge, conscious disregard, authorization, ratification or act of oppression,

San Diego Biz Law, APC
4225 Executive Square, 6ᵗʰ Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

within the meaning of Civil Code § 3294.

90. The actions and conduct of TuSimple were intended to cause injury to Lindland and to deprive him of property and legal rights. TuSimple's despicable conduct justifies an award of exemplary and punitive damages in an addition to all other awards.

**THIRD CLAIM FOR RELIF**

**HOSTILE WORK ENVIRONMENT**

**UNDER CA GOV'T CODE §12923(a)**

91. Under California Government Code § 12923(a), "harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being."

92. Under California Government Code § 12923(a), "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job."

93. During his employment, Lindland was repeatedly harassed and subjected to a hostile work environment. At all times relevant hereto, management-level employees were the main cause of the hostile work environment. In addition, when the hostile behaviors were adopted by other employees, management-level employees had reason to know of, or should have known of and either failed, neglected, or refused to take prompt and appropriate remedial action to eradicate the unlawful conduct.

San Diego Biz Law, APC
4225 Executive Square, 6ᵗʰ Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

94. Under *Harris v. Forklift Systems, Inc.,* "whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, relevant to determining whether the plaintiff actually found the environment abusive. But no single factor is required." (*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

95. During his employment, Lindland was repeatedly harassed and subjected to a hostile work environment. At all times relevant hereto, management-level employees were the main cause of the hostile work environment. In addition, when the hostile behaviors were adopted by other employees, management-level employees had reason to know of, or should have known of and either failed, neglected, or refused to take prompt and appropriate remedial action to eradicate the unlawful conduct.

96. Lindland was isolated by the rest of the employees based on the insistence of TuSimple's managers and CTO. The pressure on other employees not to interact with Lindland was so severe that other employees asked Lindland not to include them in his e-mails because of **fear of retaliation** in case someone could have suspected collaboration with Lindland. When other management-level employee, Mr. Skinner, physically attacked and tried to intimidate Lindland management ***willfully*** failed to take actions.

## **Malice**

97. The acts and conduct of TuSimple, constituted "malice" as defined by California Civil Code § 3294(c)(1)): "the conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and

conscious disregard of the rights or safety of others."

98.  TuSimple engaged in a despicable conduct with a willful and conscious disregard of the rights or safety of Lindland as well as concern for his career and career reputation. The acts of TuSimple were conducted fraudulently, maliciously and oppressively and with the advance knowledge, conscious disregard, authorization, ratification or act of oppression, within the meaning of Civil Code § 3294.

99. The actions and conduct of TuSimple were intended to cause injury to Lindland and to deprive him of property and legal rights. TuSimple's despicable conduct justifies an award of exemplary and punitive damages in an   addition to all other awards.

### FOURTH CLAIM FOR RELIF

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

100. The covenant of good faith and fair dealing is implied in all contracts and an allegation of its breach is an allegation of an obligation arising out of the contract. (*Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 690 (1988)).

101. The covenant is read into contracts and functions "as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." (*Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal.App.4th 1230, 1244 (2013)).

102. During the time Lindland was employed by the TuSimple he had never refused to conduct his job duties, as witnessed by the good performance reviews he obtained. TuSimple's manager continuously prevented Lindland from conducting his job duties.

103. On many occasions, Hou asked Lindland to stop working on the current model because it

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

was wrong, even though that was a model that team under Hou's supervision provided to Lindland.

104. More than one manager at TuSimple asked Lindland to overlook his duties and sign safety certification without conducting tests, or at least with no respect for the international standard Lindland had to observe. Lindland, however, had never received any reprimand or disciplinary sanction. He was often reassured that his work was aligned with TuSimple's standards, and then discharged for "not doing his job" and "disruptiveness."

105. No employee at TuSimple had ever filed a complaint against Lindland. Clearly, the model had safety issues, Hou was aware of that, but had wanted to deceive the investors. His only impediment was Lindland and the fact that he is a well-respected expert in the realm of safety and sought to adhere to the safety of humans.

106. Without misconduct on the part of Lindland and without good or lawful cause, TuSimple breached the implied covenant of good faith and fair dealing by engaging in retaliation and harassment of Lindland. The breaches by TuSimple of the implied covenant of good faith and fair dealing have resulted in Lindland losing his income, earnings, benefits and other consequential damages in a sum to be shown according to proof.

**Malice**

107. The acts and conduct of TuSimple, constituted "malice" as defined by California Civil Code § 3294(c)(1)): "the conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."

108. TuSimple engaged in a despicable conduct with a willful and conscious disregard of the rights or safety of Lindland as well as concern for his career and career reputation. The acts

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

of TuSimple were conducted fraudulently, maliciously and oppressively and with the advance knowledge, conscious disregard, authorization, ratification or act of oppression, within the meaning of Civil Code § 3294.

109. The actions and conduct of TuSimple were intended to cause injury to Lindland and to deprive him of property and legal rights. TuSimple's despicable conduct justifies an award of exemplary and punitive damages in an  addition to all other awards.

## FIFTH CLAIM FOR RELIEF

## CONVERSION

110. Tort of "conversion" is an act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. (*Multani v. Knight*, 23 Cal.App.5th 837, 852 (2018)).

111. The act constituting conversion must be knowingly or intentionally done, but a wrongful intent is not necessary. (Id. at 853-54)

112. Lindland's and TuSimple's employment agreement granted Plaintiff  share options that did not vest as he was terminated before they could vest. Although Lindland 's employment terminated before the 3-year vesting-cliff, he never obtained all of his options.

113. TuSimple converted the agreed upon grant by intentionally or knowingly failing to provide it to Mr. Lindlnad, or, in alternative, by terminating Lindland's employment fraudulently before the 3-year term.

## **Malice**

114. The acts and conduct of TuSimple, constituted "malice" as defined by California Civil Code § 3294(c)(1)): "the conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

conscious disregard of the rights or safety of others."

115. TuSimple engaged in a despicable conduct with a willful and conscious disregard of the rights or safety of Lindland as well as concern for his career and career reputation. The acts of TuSimple were conducted fraudulently, maliciously and oppressively and with the advance knowledge, conscious disregard, authorization, ratification or act of oppression, within the meaning of Civil Code § 3294.

116. The actions and conduct of TuSimple were intended to cause injury to Lindland and to deprive him of property and legal rights. TuSimple's despicable conduct justifies an award of exemplary and punitive damages in an addition to all other awards.

### PRAYER

Plaintiff prays for judgment against Defendant and each of them as follows:

1. For the severance package amounting to $80,0000;

2. For the granting of the full 150,000 share options at the strike price determined as per the employment contract;

3. For declaratory relief as to whether the share options that have already been earned according to the employment contract are being unreasonably withheld by Defendant TuSimple and should be vested immediately;

4. For compensatory and special damages according to proof at the time of trial but no less than three years'pay;

5. For general damages according to proof at the time of trial;

6. For restitution damages according to proof at the time of trial;

7. For punitive and exemplary damages where allowed by law;

8. For treble damages pursuant to the applicable statutes, in an amount to be proven at trial;

1    9.  For attorneys' fees pursuant to the applicable statutes; and

2    10. For such other and further relief as the Court may deem just and proper.

Dated: March 10th, 2021                        **SAN DIEGO BIZ LAW, APC**

By: _/s/Steven Riznyk_____
       Steven Riznyk, Esq.
       Attorney for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 10th, 2021                        **SAN DIEGO BIZ LAW, APC**

By: _/s/Steven Riznyk_____
       Steven Riznyk, Esq.
       Attorney for Plaintiff

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

San Diego Biz Law, APC
4225 Executive Square, 6th Floor
La Jolla, CA 92037
Voice: 619.793.4827 / Fax 310.388.5933

**VERIFICATION**

UNITED STATES DISTRICT COURT        )
                                    ) ss.
SOUTHERN DISTRICT OF CALIFORNIA)


    I, JOHN LINDLAND, am a Plaintiff to this action, and hereby state that I have read the foregoing **COMPLAINT** and know its contents. The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

    I declare under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct.

    EXECUTED this 10th day March, 2021 at Tucson, Arizona.



JOHN LINDLAND

VERIFICATION OF COMPLAINT

1